UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HELPFUL HOUND, L.L.C.                                    CIVIL ACTION

VERSUS                                                       NO. 18-3500
                                                             c/w 18-3594

NEW ORLEANS BUILDING                              SECTION "R" (2)
CORPORATION AND CITY OF NEW
ORLEANS

## PRELIMINARY INJUNCTION ORDER AND REASONS

New Orleans Building Corporation and the City of New Orleans move to preliminarily enjoin Helpful Hound, L.L.C. and related parties from using the mark "St. Roch Market" at locations other than the food halls of the same name in New Orleans and Miami.[1]  The Court issues the preliminary injunction contained in this Order for the reasons discussed below.

## I.    BACKGROUND

This case arises out of a dispute over use of the name "St. Roch Market."  The original St. Roch Market is located at 2381 St. Claude Avenue, on the neutral ground of St. Roch Avenue.  It is one of the few remnants of the once-extensive network of public markets in New Orleans.[2]  According to

---

[1]    R. Doc. 18.
[2]    R. Doc. 18-6 at 1.

defendants, St. Roch Market dates back to 1838, when an open-air market was built at the site.[3] It was originally known as Washington Market, just as St. Roch Avenue used to be known as Washington Avenue.[4] The present structure was designed and built in 1875.[5] According to the City, the market was enclosed in 1914, and rebuilt in 1937 by the Works Progress Administration.[6] By 1964, the market had acquired its distinctive signage:[7]



*Figure 1: St. Roch Market, January 28, 1964*

---

[3]    R. Doc. 21 at 2.

[4]    *Id.*

[5]    *See* Jeffrey Chusid et al., *St. Roch Market: Historic Structure Report and Rehabilitation Study* 8 (July 19, 2006), http://project-neworleans.org/urbananalysis/strochmarketbook.pdf.

[6]    Case No. 18-3594, R. Doc. 1 at 7-8 ¶¶ 21-22.

[7]    Case No. 18-3594, R. Doc. 1-3.

The City leased stalls in St. Roch Market to various food vendors until 1945.[8]  From 1945 until the 1990s, the City leased the market to the Lama family, who first operated a seafood market and po-boy restaurant at the site before converting the space to a supermarket in 1954.[9]  The City then leased the space to a different tenant, which operated a seafood market, po-boy restaurant, and Chinese food restaurant until the space was damaged by Hurricane Katrina in 2005.[10]

The City renovated St. Roch Market between 2012 and 2014.[11]  The renovation cost $3,258,873.77, of which the City contributed $555,459.34.[12] The City then sought a master tenant to operate the property.[13]  On May 10, 2014, defendant Will Donaldson submitted a proposal on behalf of a company called Launch Pad.[14]  Launch Pad proposed to "replicate the original St. Roch Market through the installation of 15 independent, local food vendors, each selling fresh and prepared foods seven days a week."[15]

---

[8]      R. Doc. 18-6 at 1.
[9]      *Id.* at 1-2.
[10]     *Id.* at 2.
[11]     R. Doc. 18-8 at 1-2.
[12]     *Id.* at 1.  The rest of the money came from FEMA ($1,169,046.17) and the Department of Housing and Urban Development's Community Development Block Grant program ($1,534,368.26).  *Id.*
[13]     *See* R. Doc. 57 at 7.
[14]     R. Doc. 18-11.
[15]     *Id.* at 1.

On September 29, 2014, New Orleans Building Corporation (NOBC) leased the building to Bayou Secret, LLC, which was allegedly established by Donaldson and his business partners.[16] The lease places a number of restrictions on Bayou Secret's use of the building. For example, the lease requires Bayou Secret to operate "a full service neighborhood restaurant" and "fresh foods market using multiple vendors in a 'stalls' concept."[17] According to the lease, "[i]t is important to [NOBC] that the fresh and prepared foods market concept remain intact."[18] Exhibit D to the lease provides that Bayou Secret "may utilize existing typeface logo for the St. Roch Market as is presently posted on the building and replicate this logo in additional locations of the building."[19]

According to Bayou Secret, it "has successfully operated St. Roch Market as a southern food hall featuring a diverse lineup of food and beverage purveyors."[20] Bayou Secret's responsibilities allegedly include identifying, securing, and managing the market's vendors, cleaning and

---

[16] R. Doc. 18-9 at 1; R. Doc. 21-1.
[17] R. Doc. 21-1 at 5.
[18] *Id.*
[19] *Id.* at 42.
[20] R. Doc. 1 at 3 ¶ 19.

maintaining the premises, and performing administrative functions for the market.[21]

Bayou Secret opened a second food hall in New Orleans, called "Auction House Market," in 2018.[22] Bayou Secret allegedly displayed a marketing banner using the "St. Roch Market" mark at this location in December 2017.[23] After NOBC CEO Cynthia Connick raised this issue with Bayou Secret, the banner was removed.[24]

Bayou Secret and related entities also opened a food hall called "St. Roch Market" in Miami in 2018.[25] Various newspaper articles and Bayou Secret's website report that Bayou Secret has plans to open additional food halls called "St. Roch Market" in other locations, including Chicago and Nashville, Tennessee.[26] The City and NOBC have not consented to the opening of additional of food halls under the name "St. Roch Market."[27]

Helpful Hound, L.L.C. (allegedly a member of Bayou Secret) applied for registration of "St. Roch Market" on April 6, 2017.[28] The U.S. Patent and

---

[21]     *Id.* ¶ 18.
[22]     R. Doc. 18-9 at 2.
[23]     *Id.*
[24]     *Id.*
[25]     *Id.*
[26]     *Id.*; *see also* R. Docs. 18-2, 18-3, 18-4.
[27]     R. Doc. 18-9 at 2.
[28]     Case No. 18-3594, R. Doc. 1-5 at 51.

Trademark Office (PTO) refused registration on the Principal Register on the ground that the mark was primarily geographically descriptive.[29] The PTO allowed registration on the Supplemental Register on September 19, 2017.[30] In April 2018, the City and Helpful Hound filed competing applications for registration of "St. Roch Market" on the Principal Register.[31] Both applications remain pending. The PTO initially refused registration of the City's mark, again on the ground that it is primarily geographically descriptive.[32] On July 5, 2018, the PTO approved the City's mark for publication on the Principal Register,[33] but then withdrew it on August 1.[34] On August 3, the PTO refused registration to the City because of a likelihood of confusion with Helpful Hound's Supplemental Register mark.[35] *See* 15 U.S.C. § 1052(d) (providing that a trademark application may be refused if it "comprises a mark which so resembles a mark registered in the [PTO], or a

---

[29]     R. Doc. 21-2 at 2.
[30]     Case No. 18-3594, R. Doc. 1-5 at 1.
[31]     R. Doc. 18-7; R. Doc. 18-13.
[32]     R. Doc. 49-5 at 2.
[33]     R. Doc. 57 at 9.
[34]     *See* PTO, Trademark Status & Document Retrieval, Serial No. 87890988,
http://tsdr.uspto.gov/#caseNumber=87890988&caseSearchType=US_AP
PLICATION&caseType=DEFAULT&searchType=statusSearch.
[35]     PTO Office Action, Serial No. 87890988 (Aug. 3, 2018),
http://tsdr.uspto.gov/documentviewer?caseId=sn87890988&docId=OOA
20180803110207#docIndex=0&page=1.

mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion").  Also on August 3, the PTO refused Helpful Hound's application on the ground that the mark is primarily geographically descriptive.[36]  The City and Helpful Hound have not yet responded to these August 3 office actions.  The PTO's actions in these proceedings do not directly affect whether the City is entitled to preliminary injunctive relief in this case.  *See Viacom Int'l v. IJR Capital Invs., L.L.C.*, 891 F.3d 178, 185 (5th Cir. 2018) (noting that federal law protects valid though unregistered trademarks); *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 842 (5th Cir. 1990) ("Ownership of trademarks is established by use, not by registration.").

On April 3, 2018, Helpful Hound brought a declaratory judgment action against the City and NOBC.[37]  Helpful Hound's complaint seeks a declaration of noninfringement and a declaration that the registration of its service mark was proper.[38]  The City and NOBC (collectively, plaintiffs) filed suit the next day against Bayou Secret, St. Roch F&B, LLC, Helpful Hound,

---

[36]     PTO Office Action, Serial No. 87860766 (Aug. 3, 2018), http://tsdr.uspto.gov/documentviewer?caseId=sn87860766&docId=OOA2 0180802135650#docIndex=0&page=1.

[37]     R. Doc. 1.

[38]     *Id.* at 6 ¶¶ 37-38.

St. Roch Design District, LLC, Will Donaldson, Barre Tanguis, and David Donaldson (collectively, defendants).[39] Plaintiffs' complaint asserts a number of claims, including trademark cancellation, trademark infringement, trademark dilution, unfair competition, breach of trademark license or implied trademark license, breach of contract, and unauthorized use of assumed name of a governmental entity. On May 4, 2018, plaintiffs moved for a preliminary injunction to enjoin defendants "from using the designation 'St. Roch Market' or any other confusingly similar designation in connection with any business" at any location other than 2831 St. Claude Avenue in New Orleans and defendants' Miami location.[40]

---

[39] Case No. 18-3594, R. Doc. 1. According to plaintiffs' complaint, Bayou Secret changed its name to St. Roch F&B in June 2016. *Id.* at 4 ¶ 5. St. Roch Design District operates "St. Roch Market" in Miami; Will Donaldson is a manager of Helpful Hound and St. Roch Design District; Barre Tanguis is a member of Helpful Hound and a manager of St. Roch Design District; and David Donaldson is a member of Helpful Hound. *Id.* at 4-5 ¶¶ 8-11.

[40] R. Doc. 18; R. Doc. 18-15 (proposed order). Ultimately, plaintiffs also seek to enjoin the use of the mark at the Miami location. Indeed, NOBC sent a cease-and-desist letter to Bayou Secret and Helpful Hound regarding the Miami location in January 2018. R. Doc. 18-9 at 2. Plaintiffs state that they nevertheless chose not to seek a preliminary injunction against the Miami location because "an injunction at that already-open location presents difficult irreparable harm and balance of the harm issues." R. Doc. 18-1 at 2. At oral argument, counsel for plaintiffs further explained that the preliminary injunction would merely preserve the status quo.

## II.    LEGAL STANDARD

A party may obtain a preliminary injunction only if: (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that the movant will suffer irreparable harm if the injunction is not granted; (3) the threatened injury to the movant outweighs the potential injury to the nonmovant; and (4) the preliminary injunction will not disserve the public interest.  *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).  When evaluating whether the movant has satisfied these requirements, the Court must remember that "[a] preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements."  *Id.* Granting a preliminary injunction is "the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## III.    DISCUSSION

### A.    Trademark Infringement

Plaintiffs first seek a preliminary injunction based on trademark infringement under the Lanham Act.  *See* 15 U.S.C. §§ 1051, *et seq.*  The Lanham Act provides a cause of action for trademark infringement against a

person who "uses (1) any reproduction, counterfeit, copy[,] or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution[,] or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008) (quoting *Boston Prof'l Hockey Ass'n v. Dall. Cap & Emblem Mfg.*, 510 F.2d 1004, 1009-10 (5th Cir. 1975)). The Fifth Circuit has spoken directly to what a party must show in order to obtain a preliminary injunction for trademark infringement:

> First, he must prove that the name he seeks to protect is eligible for protection. He must then prove he is the senior user. Having proven these elements he must then show a likelihood of confusion between his mark and that of the defendant. Finally, because he is asking for the equitable remedy of an injunction, he must show that the likelihood of confusion will actually cause him irreparable injury for which there is no adequate legal remedy.

*Union Nat'l Bank*, 909 F.2d at 844; *see also Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008).

### 1.    Protectability

The Lanham Act defines a service mark (*i.e.*, a trademark used for services rather than goods) as "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish the services of one person . . . from the services of others and to indicate the

source of the services, even if that source is unknown."  15 U.S.C. § 1127; *see also Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th Cir. 2010).  A mark must be distinctive to be protectable.  *Amazing Spaces*, 608 F.3d at 237.  Certain marks, including words "that are 'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent) are held to be inherently distinctive."  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210-11 (2000).  Marks that are not inherently distinctive must acquire "secondary meaning" to be protectable.  *Id.* at 211.

The parties agree that the mark is protectable; each side seeks to protect it against the other's use.  The Court nevertheless addresses this element because the Patent and Trademark Office (PTO) refused registration on the Principal Register.[41]  "[R]egistration of a mark with the PTO constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services."  *Amazing Spaces*, 608 F.3d at 237.  As noted earlier, lack of registration is not fatal to a trademark infringement claim because "the Lanham Act 'protects qualifying unregistered marks.'"  *Viacom Int'l*, 891 F.3d at 185 (quoting *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 267 (5th Cir. 1999)).  The PTO found that "St. Roch Market" was

---

[41]     R. Doc. 21-2 at 2.

not registrable because it was merely descriptive. Specifically, the mark was "geographically descriptive of the origin of the applicant's services."[42] *See* 15 U.S.C. § 1052(e). The PTO added the mark to the Supplemental Register,[43] which means that the PTO regarded "St. Roch Market" as "capable of" distinctiveness. 15 U.S.C. § 1091(a); *see also T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 909 (S.D. Tex. 2014) ("While supplemental registration does not create a statutory presumption of validity, the mark may still become distinctive and legally protectable through its use in commerce.").

"A mark is geographically descriptive if it describes to consumers the geographic origin of the goods or services rather than the source of the goods or services." *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1538 (S.D. Tex. 1996) (citing *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 594 (6th Cir. 1989)). A mark is not descriptive merely because it contains a geographic term, especially if "the geographic meaning is minor, obscure, remote, or unconnected with the goods." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 486 (5th Cir. 1971); *see also id.* ("Additionally, it has been noted that a mark is not

---

[42]     *Id.*
[43]     Case No. 18-3594, R. Doc. 1-5 at 1.

primarily geographically descriptive if (1) it does not identify the place or the region from which the goods come, or (2) it does not suggest that the goods come from the place or region named by the mark."). But a mark is geographically descriptive if "a logical connection can be made between the product and the geographical term." *Burke-Parsons-Bowlby*, 871 F.2d at 595.

As an initial matter, the Court distinguishes between use of the mark in New Orleans and prospective use of the mark in other cities. *See Sarco Creek Ranch v. Greeson*, 36 F. Supp. 3d 726, 733 (S.D. Tex. 2014) ("[T]he services-place association is evaluated 'from the perspective of the relevant public for those services.'" (quoting *In Re MCO Props. Inc.*, 38 U.S.P.Q.2d 1154 (T.T.A.B. Nov. 27, 1995)). Like the PTO, the Court finds that use of the mark in New Orleans is geographically descriptive. St. Roch is the name of the avenue on which the market is located, and is one name for the neighborhood in which it is situated. The geographic element of the mark is clearly connected to the services provided by St. Roch Market in New Orleans. Thus, the mark identifies the place where the services are provided. This association between place and services makes St. Roch Market geographically descriptive for consumers in the New Orleans area.

Potential consumers in Chicago, Nashville, and other cities far afield likely would not make the same association. St. Roch—unlike, say, the French Quarter—is not a place name that is generally recognizable by the American public. *Cf. In re The Newbridge Cutlery Co.*, 776 F.3d 854, 862 (Fed. Cir. 2015) (substantial evidence did not support "[t]he conclusion that Newbridge, Ireland, a town of less than twenty thousand people, is a place known generally to the relevant American public"). Nor is there any reason to believe that the neighborhood of St. Roch would be any less obscure to potential customers at defendants' prospective food halls. Thus, the use of the mark outside the New Orleans area is inherently distinctive rather than geographically descriptive.

Because plaintiffs have used the mark only in New Orleans, they must show secondary meaning in order to establish the protectability of the mark. Secondary meaning "occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart*, 529 U.S. at 211 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n.11 (1982)); *see also Restatement (Third) of Unfair Competition* § 13 cmt. e (1995) ("Secondary meaning exists only if a significant number of prospective purchasers understand the term, when used in connection with a particular kind of good, service, or business,

not merely in its lexicographic sense, but also as an indication of association with a particular, even if anonymous, entity."). "Secondary meaning 'in connection with geographically descriptive marks means that the mark no longer causes the public to associate the goods with the geographical location, but to associate the goods with a particular product or source of the product.'" *Sarco Creek Ranch*, 36 F. Supp. 3d at 732 (citation omitted).

A party's burden of demonstrating secondary meaning "is substantial and requires a high degree of proof." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 544 (5th Cir. 2015) (quoting *Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005)). In evaluating whether a mark has acquired secondary meaning, courts consider the following factors:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the mark.

*Viacom*, 891 F.3d at 190 (quoting *Test Masters Educ. Servs. v. Robin Singh Educ. Servs., Inc.*, 799 F.3d 437, 445 (5th Cir. 2015)). The inquiry is primarily empirical. *Nola Spice*, 783 F.3d at 544. Survey evidence is "the most direct and persuasive way of establishing secondary meaning," but it is not necessary. *Id.* (quoting *Amazing Spaces*, 608 F.3d at 248).

Because the protectability of the mark is uncontested, the parties provide little evidence of secondary meaning. Nevertheless, it is clear that St. Roch Market has long been used as the name of a specific food market in New Orleans. Both parties state that St. Roch Market has been known as such since the late 1800s.[44] Attached to plaintiffs' complaint is a photograph dated January 28, 1964, portraying St. Roch Market with its distinctive sign.[45] The photograph shows an additional sign, which reads "Lama's Meat Market." The Lama family later relocated their business—now a restaurant called "Lama's St. Roch"—to Mandeville, Louisiana.[46] Their website emphasizes the restaurant's connection to St. Roch Market.[47] The Lama family's continued use of the name "St. Roch" outside of the St. Roch neighborhood indicates an association between the name and the provision of food that transcends geographic boundaries. This undisputed evidence, though limited, suggests a lengthy use of the mark in connection with the

[44]  *See* R. Doc. 18-1 at 3; R. Doc. 21 at 2.
[45]  Case No. 18-3594, R. Doc. 1-3.
[46]  *See* R. Doc. 21 at 14; *see also Lama's St. Roch*, https://www.strochmandeville.com (last visited June 18, 2018).
[47]  *See Lama's St. Roch*, https://www.strochmandeville.com/about (last visited June 18, 2018) ("By 1947 the family stepped into the New Orleans St. Roch Market and quickly became the area's favorite place for seafood of all kinds, St. Roch Seafood became a staple business in the community and continued to serve the New Orleans area as the sole occupant of the Market for over 50 years.").

provision of food. *Cf. Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 421 (4th Cir. 1998) (agreeing with district court's finding of secondary meaning because "the undisputed evidence showed that PINEHURST had been used in connection with [plaintiff's] golf courses since the turn of the century"). Thus, the secondary meaning of St. Roch Market is that of a specific food market in New Orleans.

Defendants, like the Lama family, seek to capitalize on this secondary meaning. For example, a screenshot of defendants' website for its Miami location states that "St. Roch Market is a contemporary, multi-vendor food hall brand, hailing from New Orleans," and that "[t]his popular New Orleans food hall has made its way down to Miami."[48] Another screenshot from the website gives a brief history of St. Roch Market in New Orleans.[49] These deliberate associations suggest that defendants themselves believe the mark has "secondary meaning that could influence consumers, which further supports the conclusion that there is secondary meaning here."[50] *Bd. of*

---

[48]   R. Doc. 18-12 at 3.

[49]   *Id.* at 6.

[50]   Of course, the meaning of "St. Roch Market" created by defendants in Miami and other cities is not technically "secondary" because the mark is inherently distinctive there. Moreover, defendants' use of the mark outside New Orleans is not necessarily indicative of the mark's meaning in the New Orleans area. But this use in other cities suggests a nascent association between the mark and the provision of food services in the minds of the American public, millions of whom visit New Orleans each year. *See* Jennifer

*Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 477 (5th Cir. 2008).  In light of this evidence, it is substantially likely that plaintiffs will be able to establish secondary meaning of the mark in the New Orleans area.  Thus, it is substantially likely that the mark is protectable both in New Orleans (where it is has secondary meaning) and in cities far afield (where the mark is inherently distinctive).

### 2.   Use

The parties chiefly dispute whose use of the mark is senior.  "The first one to use a mark is generally held to be the 'senior' user and is entitled to enjoin other junior users from using the mark, or one that is deceptively similar to it, subject to limits imposed by the senior user's market and natural area of expansion."  *Union Nat'l Bank*, 909 F.2d at 842-43.  The senior user's use must be continuous up until the present, 2 *McCarthy on Trademarks and Unfair Competition* § 16:9 (5th ed. 2018), although some evolution in use is tolerated, *id.* § 17:24; *see also* 4 *Callmann on Unfair Competition, Trademarks and Monopolies* § 20:4 (4th ed. 2018) ("The product or service on which priority of use is predicated need not be the same as the product or

---

Larino, *How Many Tourists Visited New Orleans in 2017? The Answer Depends on Who You Ask*, NOLA.com | Times-Picayune (May 14, 2018), https://www.nola.com/business/index.ssf/2018/05/tourist_count_new_orleans_cvb.html; *see also* R. Doc. 18-3 at 1 (Chicago Eater article referring to St. Roch Market as "a New Orleans staple").

service for which the mark rights are later asserted; a relation between them may suffice."). For a mark that is distinctive only because it has acquired secondary meaning, the senior user is the party that first developed secondary meaning. *See 2 McCarthy on Trademarks and Unfair Competition* § 16:34.

Generally, a senior user's common law rights are geographically limited.[51] Two Supreme Court cases, *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916) (*Tea Rose*), and *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918), "have given rise to the general proposition that 'a senior user has exclusive rights to a distinctive mark anywhere it was known prior to the adoption of the junior user.'" *C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 700 (5th Cir. 2001) (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 295 n.4 (3d Cir. 1986)). In other words, "the national senior user of a mark cannot oust a geographically remote good-faith user who has used the mark first in a remote trade area." *2 McCarthy on Trademarks and Unfair Competition* § 26.4. "A 'remote' territory is one where, at the critical date of the junior user's first use, the senior user's mark was not known by customers in that territory, such that no one would have

---

[51]    These geographical limitations do not apply if the mark is properly registered on the Principal Register. *See* 15 U.S.C. § 1057.

been confused as to source." *Id.* (footnote omitted). Under Fifth Circuit precedent, the good faith inquiry takes into consideration both the junior user's knowledge of the plaintiff's use and the junior user's "intent to benefit from the reputation or good will of the plaintiff." *El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 726 (5th Cir. 1954); *see also C.P. Interests*, 238 F.3d at 700.

It is undisputed that the City has leased St. Roch Market to tenants who provide food services since the nineteenth century. The City leased stalls in to various food vendors until 1945.[52] The Lama family was the sole tenant from 1945 until the 1990s, and first operated a seafood market and po-boy restaurant at the site before converting the space to a supermarket in 1954.[53] Every lease to a member of the Lama family required that the lessee use the space for some sort of food market.[54] From the 1990s until 2005, the City leased the space to a different tenant who operated a seafood market, po-boy restaurant, and Chinese food restaurant under the name St. Roch Market.[55]

---

[52] R. Doc. 18-6 at 1.

[53] *Id.* at 1-2.

[54] *See generally* R. Doc. 49-4.

[55] R. Doc. 18-6 at 2. This lease does not appear in the record, although there is a sublease between St. Roch Market, Inc. (run by the Lama family) and Nhu Thi-Nguyen Le dated July 17, 1996. *See* R. Doc. 49-4 at 31. The sublease requires the sublessee to operate a seafood market on the premises under the name St. Roch Seafood Market. *Id.* at 32. The City sent a letter to A.J. Lama on February 20, 1997, indicating that the City did not consent to

The market was damaged by Hurricane Katrina and sat vacant until the City completed renovations in 2014.[56] NOBC then leased the space to Bayou Secret, which has since operated a food hall in the building pursuant to the terms of the lease. Although the use of St. Roch Market has evolved over time, each prior use is substantially identical to its present use as a food hall. *See Big Blue Prods. Inc. v. IBM Corp.*, 19 U.S.P.Q.2d 1072 (T.T.A.B. 1991) (holding that for purposes of registration, a prior use may be tacked onto a subsequent "substantially identical" use); *see also C.P. Interests*, 238 F.3d at 700-01 (citing *Big Blue v. IBM*); *Ludden v. Metro Weekly*, 8 F. Supp. 2d 7, 15 (D.D.C. 1998) (holding that an advice column and a stage show inspired by that column were sufficiently related for a jury to find that use of a mark in connection with one established priority of use of the mark in connection with the other). The various uses of St. Roch Market over time are essentially different iterations of a public food market.

The critical question in this case is whether the landlord (as owner of the food hall) has seniority over the tenant (as operator of the food hall). According to a leading treatise, "[o]wnership of a mark identifying a business

---

the sublease and would terminate the lease on February 28, 1997. *Id.* at 20. It is unclear whether the City ever signed a formal lease for St. Roch Market with Nhu Thi-Nguyen Le, or anyone else, until the Bayou Secret lease was signed in 2014.

[56]     R. Doc. 18-6 at 2.

carried on at rented premises will depend on an informed balancing of the policies of customer perception and contractual provisions (express or implied) between landlord and tenant." *See* 2 *McCarthy on Trademarks and Unfair Competition* § 16:38. Of course, if the tenant creates the mark and owns the business with which the mark is associated, the tenant owns the mark. *See id.* "But the rule is otherwise where the business has become inseparably identified with a particular building." 4 *Callmann on Unfair Competition, Trademarks and Monopolies* § 20:40. A number of courts have held that the name of a public building used in commerce belongs to the owner of that building. *See, e.g.*, *City of New York v. Tavern on the Green, L.P.*, 427 B.R. 233 (S.D.N.Y. 2010); *Norden Rest. Corp. v. Sons of the Revolution in the State of N.Y.*, 415 N.E.2d 956 (N.Y. Ct. App. 1980); *see also Shubert v. Columbia Pictures Corp.*, 72 N.Y.S.2d 851, 855 (Sup. Ct. 1947) ("[T]he good will of a public building, such as a theatre or hotel, runs with the building . . . .").

In *Norden Restaurant*, the defendant owned a building in lower Manhattan that had been called Fraunces Tavern since the eighteenth century. The plaintiff leased the space and operated a restaurant there called Fraunces Tavern Restaurant. Although the plaintiff-tenant registered "Fraunces Tavern" as a service mark, the court held that the defendant-

landlord's common law rights were superior. *Norden Rest.*, 415 N.E.2d at 957. The court focused on provisions of the lease that required the tenant to conduct business only under the name "Fraunces Tavern Restaurant," and limited the tenant's right to use the name to the building itself. *Id.* According to the court, the tenant thereby "accepted the licensed use of the name upon the terms dictated by the defendant," and could not "assert ownership" of the name against the defendant. *Id.*

In another New York case, *City of New York v. Tavern on the Green*, the city owned a building in Central Park called Tavern on the Green. The building was built in 1934 and then leased to various companies that operated a restaurant under the name "Tavern on the Green." The defendants, who had leased the building and operated the restaurant since 1973, registered the name of the restaurant as a service mark in 1981. The court nevertheless found that the city had a superior common law right. *Tavern on the Green*, 427 B.R. at 241. The court noted that the city established the restaurant over thirty-five years before the defendants began to operate it, named the restaurant, selected its tenants, and "made significant investments to ensure" its success. *Id.* The court also noted that the 1973 lease required the tenant to operate Tavern on the Green as a restaurant and gave the city some managerial power. For example, the lease

required the manager to be "satisfactory to the City," required "a sufficient number of trained attendants," and required that the attendants "wear a City-approved uniform." *Id.* at 238. "Because the undisputed facts show[ed] that the City established and continuously maintained a restaurant under the name 'Tavern on the Green' at the same location in New York's Central Park since 1934," the court held that "the City ha[d] a protectible interest in that name under" state law. *Id.* at 242.

The Ninth Circuit came to the opposite conclusion, ruling in favor of a tenant, in *Department of Parks and Recreation for the State of California v. Bazaar del Mundo*, 448 F.3d 1118 (9th Cir. 2006). There, the state had owned two historic buildings in Old Town San Diego, Casa de Pico and Casa de Bandini, since 1968. The buildings housed shops in 1968 and 1969, and Casa de Bandini served as the headquarters for San Diego's bicentennial celebration. The state granted the defendant a concession to operate restaurants in the two buildings, and the defendant began using the buildings' names in commerce in 1971 (Casa de Pico) and 1980 (Casa de Bandini). To show ownership of the marks, the state pointed to a brochure advertising the bicentennial celebration and a brochure describing the history of Old Town San Diego. Although each brochure mentioned the two buildings, neither "was designed to attract the attention of the viewer to the

marks themselves." *Id.* at 1127. The brochures therefore "fail[ed] to create any association between the marks and the tourism and recreation services provided by the Department of Parks." *Id.* Even if the state had used the marks in commerce, the court noted, such use was "merely transitory," and did not establish secondary meaning. *Id.*

The Court finds that this case more closely resembles the New York cases than *Bazaar del Mundo*. Like Tavern on the Green, St. Roch Market has long been associated with food services. The City's use of the mark has not been transitory and it achieved secondary meaning well before defendants acquired the lease in 2014. The City also designed and built the market, chose its lessees, and made significant investments to restore it after Hurricane Katrina. Defendants argue that this conduct does not suffice to establish use because there is no evidence that the City ever actually operated a market—or any other type of food service—in the building.[57] But defendants cite no authority for the proposition, implicitly rejected by *Norden Restaurant* and *Tavern on the Green*, that a landlord must operate a specific business in its building in order to acquire ownership over the building's name.[58] The Court therefore finds that plaintiffs used "St. Roch

---

[57] R. Doc. 21 at 9.
[58] Defendants also argue that the Louisiana Constitution prohibits the City from using the mark in commerce. R. Doc. 21 at 11-12. No such

Market" in commerce, and achieved secondary meaning in the mark, before defendants began to use the mark in 2014.

Moreover, the 2014 lease—like the leases in the New York cases—includes several limitations on Bayou Secret's use of the premises. Section 5.1 of the lease requires Bayou Secret to operate "a full service neighborhood restaurant" and "fresh foods market using multiple vendors in a 'stalls' concept."[59] The lease also prohibits Bayou Secret from using the building "for any other business or purpose" or "in any way that will injure the reputation of the NOBC or the Building."[60] Bayou Secret must obtain NOBC's consent to assign the lease, and NOBC may reject an assignment if the proposed transferee's use of the premises "would not be in strict conformity with" Section 5.1.[61] If Bayou Secret desires to change the use of the building, the lease requires Bayou Secret to provide NOBC "with detailed information on the proposed new or additional uses," and subjects any such

---

prohibition appears in the Louisiana Constitution of 1974, however, and the one case cited by defendants, *Public Housing Administration v. Housing Authority of the City of Bogalusa*, 129 So. 2d 871 (La. App. 1 Cir. 1961), was decided before the current version of the constitution came into effect.

[59] R. Doc. 21-1 at 5.
[60] *Id.* at 5-6.
[61] *Id.* at 18.

change to NOBC's approval.[62]  The lease also provides for certain business hours, though it gives Bayou Secret some discretion to vary the hours.[63]

Additionally, the lease permits Bayou Secret to "utilize existing typeface logo for the St. Roch Market as is presently posted on the building and replicate this logo in additional locations of the building."[64]  But the lease requires the City's consent to change or add exterior signage, and gives the City "the right to disapprove and require the removal of any sign, graphics, lettering, or advertising readily visible from outside" the market.[65]  The lease also prohibits the use of "any signs or displays illuminated electrically or otherwise."[66]

These terms do not give plaintiffs as much managerial authority as the Tavern on the Green lease gave the City of New York, nor does it restrict the tenant's use of the building name as explicitly as the Fraunces Tavern lease did.  Nevertheless, the lease's restrictions on Bayou Secret's use of St. Roch Market further buttresses the Court's finding that plaintiffs own the mark.

Defendants also argue that even if plaintiffs owned the mark, their common law rights do not extend to the locations where defendants plan to

---

[62]    *Id.* at 10.
[63]    *Id.*
[64]    *Id.* at 45.
[65]    *Id.* at 6-7.
[66]    *Id.* at 10.

open additional food halls called "St. Roch Market." Chicago and Nashville may very well be remote locations. But, as noted earlier, the evidence suggests that defendants intend to capitalize on the goodwill and reputation developed by plaintiffs. Screenshots from defendants' website for its Miami location include a number of references to New Orleans:

- "St. Roch Market is a contemporary, multi-vendor food hall brand, hailing from New Orleans."

- "This popular New Orleans food hall has made its way down to Miami."

- "[A]t St. Roch, a New Orleans-based concept, chefs can try out their ideas on a small scale before launching stand-alone restaurants."

- "In 1875, the original St. Roch Market in New Orleans was named in honor of the Patron Saint of miraculous cures. For months prior, the neighborhood held vigil to Saint Roch, praying for an end to a devastating yellow fever epidemic. Once the fever broke, the grateful community enclosed the Market and gave it its official name.

  "In its lifetime, the New Orleans Market has gone from an outdoor selling space on the neutral ground, to the fish market that was shut down by Katrina, to the food hall we know and love today. But it's always been a gathering place, a place where neighbors become friends and break bread together. Each day, we strive to keep the spirit of community and the resilience inherent to the St. Roch Market name alive."[67]

---

[67]     R. Doc. 18-12 at 3-6.

This evidence indicates that defendants seek to use the mark in bad faith. *See C.P. Interests*, 238 F.3d at 700; *El Chico*, 214 F.2d at 726. Thus, plaintiffs' trademark rights are not limited geographically.

### 3. *Likelihood of confusion*

The most important question in a trademark infringement action "is whether one mark is likely to cause confusion with another." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009). The Fifth Circuit relies on a nonexhaustive list of "digits of confusion" to determine whether a likelihood of confusion exists: "(1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers." *Id.* at 227. Generally, no single "digit" is treated as dispositive of the existence of a likelihood of confusion. *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985).

As an initial matter, the Court notes that the parties are not necessarily in direct competition with each other because plaintiffs do not intend to establish additional food halls called "St. Roch Market" outside New Orleans. But "[d]irect competition between the parties' services or products is not required in order to find a likelihood of confusion." *Elvis Presley Enters.,*

*Inc. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998). "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." *Id.*

Mark similarity weighs heavily in favor of finding a likelihood of confusion. "'The relevant inquiry is whether, under the circumstances of the use,' the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Capece*, 141 F.3d at 201 (quoting *Restatement (Third) of Unfair Competition* § 21 cmt. c). "Mark similarity 'is determined by comparing the marks' appearance, sound, and meaning.'" *Xtreme Lashes*, 576 F.3d at 228 (quoting *Capece*, 141 F.3d at 201). "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." *Id.* (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260 (5th Cir. 1980)). Here, plaintiffs' and defendants' marks are identical. Indeed, both sides assert ownership over the same mark. Defendants' Miami food hall even uses the same typeface as the signage on St. Roch Market in New Orleans. Mark similarity therefore weighs heavily in favor of a likelihood of confusion. *See, e.g.*, *Paulsson*, 529 F.3d at 310-11 (affirming preliminary injunction in trademark infringement case even though district court relied solely on mark similarity); *see also Champions Golf Club, Inc. v. The*

*Champions Golf Club, Inc.*, 78 F.3d 1111, 1119 (6th Cir. 1996) (noting that mark similarity "is a factor entitled to considerable weight").

Service similarity also suggests a likelihood of confusion. Defendants intend to use the mark in connection with a food hall—the same services currently provided at St. Roch Market in New Orleans. Plaintiffs and defendants are responsible for slightly different aspects of running a food hall: plaintiffs own the space and lease it to defendants, while defendants operate the food hall and lease stalls to different vendors. But the Fifth Circuit has not regarded such minor differences as material. *See, e.g.*, *Viacom*, 891 F.3d at 193-94 (noting that services similarity indicated a likelihood of confusion because both marks were associated with a restaurant, even though the plaintiff produced a television show featuring a restaurant and the defendant sought to operate an actual restaurant); *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980) (noting "a strong similarity between the[] wares and services" of Exxon and car repair shop). In light of mark similarity and associations with the New Orleans St. Roch Market on news and advertising media,[68] the services are similar enough to cause confusion as to whether the New Orleans St. Roch

---

[68]    *See, e.g.*, R. Doc. 18-3 (Chicago Eater article); R. Doc. 18-4 (Crain's Chicago Business article); R. Doc. 18-5 (New Orleans Eater article); R. Doc. 18-12 (screenshots from defendants' website).

Market and defendants' other prospective food halls called "St. Roch Market" are affiliated.

Defendants' intent also weighs in favor of finding a likelihood of confusion. This "inquiry focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 455 (5th Cir. 2017). The Fifth Circuit has noted that "the intent of defendants in adopting their mark is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity." *Am. Rice*, 518 F.3d at 332 (quoting *Chevron Chem. Co. v. Voluntary Purchasing Grps., Inc.*, 659 F.2d 695, 703-04 (5th Cir. 1981)) (parentheses omitted). As explained earlier, defendants have deliberately created associations between St. Roch Market in New Orleans and their Miami food hall.[69] There is no reason to believe that defendants will not also create such associations with regard to their prospective food halls in other cities. Thus, it is apparent that defendants seek to "appropriate the good will and good name" developed by

---

[69]     *See, e.g.*, R. Doc. 18-12 at 3 ("This popular New Orleans food hall has made its way down to Miami.").

plaintiffs.  *Nat'l Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co.*, 362 F.2d 374, 377 (5th Cir. 1966).

On the other hand, the physical distances between New Orleans and the cities where defendants plan to open additional food halls called "St. Roch Market" weigh against finding a likelihood of confusion.  Because of these distances, the overlap in potential customers of St. Roch Market in New Orleans and defendants' future locations is likely small.  The strength of the mark, which is descriptive rather than inherently distinctive, also weighs against finding a likelihood of confusion.[70]  There is little evidence pertaining to the remaining factors, so these factors do not weigh strongly either way.

In weighing the factors, the Court finds that mark similarity, services similarity, and defendants' deliberate attempts to associate their food halls outside New Orleans with St. Roch Market in New Orleans outweigh the

---

[70]    Defendants further argue that use of the name "St. Roch" by third parties tends to reduce the likelihood of confusion.  R. Doc. 21 at 14.  But there is no evidence that third parties are using the name "St. Roch *Market*," which is the term plaintiffs seek to enjoin defendants from using.  *Cf. Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 317 (5th Cir. 1981) (weakness of the mark weighed against finding a likelihood of confusion because the only similarity in the marks was the use of the word "sun," and "[t]he evidence abundantly established existing third-party use of the name 'Sun,' both within and without the financial community").  That the marks of a few third parties also incorporate "St. Roch" merely reflects the geographic descriptiveness and secondary meaning of that term, issues that the Court has already addressed.

small overlap in potential customers and the weakness of the mark. The Fifth Circuit has emphasized that finding a likelihood of confusion is particularly appropriate when a defendant's use of the plaintiff's mark "is designed to create the illusion of affiliation" with the plaintiff. *Smack Apparel*, 550 F.3d at 483. "This creation of a link in the consumer's mind . . . and the intent to directly profit therefrom results in 'an unmistakable aura of deception' and likelihood of confusion." *Id.* at 484 (quoting *Bos. Athletic Ass'n v. Sullivan*, 867 F.2d 22, 35 (1st Cir. 1989)). Plaintiffs have therefore shown a substantial likelihood of success on the merits of their trademark infringement claim.

## B.   Breach of Trademark License

Plaintiffs also seek a preliminary injunction based on breach of trademark license. This claim essentially asserts breach of contract under Louisiana law. *See Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 366 (5th Cir. 2004) (treating breach of trademark license claim as breach of contract claim); *see also* 3 *McCarthy on Trademarks and Unfair Competition* § 18:43 ("Trademark license contract disputes are governed by the general rules of contract interpretation."). To prevail on a breach of contract claim under Louisiana law, an obligee must establish that (1) the obligor undertook an obligation to perform, (2) "the obligor failed to perform

the obligation," and (3) "the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 68 So. 3d 1099, 1108-09 (La. App. 4 Cir. 2011).

Plaintiffs argue that defendants' use of the mark outside St. Roch Market in New Orleans violates the 2014 lease.[71] The lease does not explicitly prohibit such use of the mark; Exhibit D to the lease merely permits Bayou Secret to "utilize existing typeface logo for the St. Roch Market as is presently posted on the building and replicate this logo in additional locations of the building."[72] This language clearly grants Bayou Secret a license to use the mark inside St. Roch Market in New Orleans. According to the Fifth Circuit, "the prevailing view is that one who exceeds the scope of [such a] license" may be liable for both breach of contract and trademark infringement. *Brennan's*, 376 F.3d at 364; *see also Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 535 (5th Cir. 2012) (agreeing with the proposition "that the terms of the trademark license circumscribe a trademark licensee's right to use a protected mark"); *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456, 473-75 (D. Mass. 1997) (analyzing breach of trademark license claim). But "a party cannot enforce a license it

---

[71]     R. Doc. 18-1 at 19-20.
[72]     R. Doc. 21-1 at 45.

does not control." *J & J Sports Prods., Inc. v. Morales*, 226 F. Supp. 3d 730, 733 (W.D. Tex. 2016) (citing *Brennan's*, 376 F.3d at 364).

These cases suggest that if a party owns a mark, then a license to use that mark implies an obligation not to use the mark outside the scope of the license. For example, in *Digital Equipment*, the plaintiff licensed the mark "AltaVista" to the defendant. 960 F. Supp. at 473. The license read: "Digital hereby grants to ATI a nonexclusive, nontransferable license to use the trademark . . . as part of the corporate name 'Altavista Technologies, Inc.' and as part of the url 'http://www.altavista.com,' and in accordance with and subject to the terms and conditions of this Agreement . . . ." *Id.* at 473-74. The district court applied the maxim *expressio unius est exclusio alterius* in concluding that the license's "express grant of permitted uses precludes other uses." *Id.* at 473. The court held that any other use of the mark would likely breach the license agreement, and enjoined any such use. *Id.* at 474, 478.

Here, the Court has already found a substantial likelihood that plaintiffs will succeed in establishing their ownership of a protectable mark. Defendants' use of the mark in connection with food halls in other cities obviously exceeds the scope of the license in Exhibit D to the 2014 lease.

Thus, the Court finds a substantial likelihood that plaintiffs will succeed on the merits of their breach of trademark license claim.

### C.     Substantial Threat of Irreparable Harm

The central prerequisite for injunctive relief "is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."   11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2018).   "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).   This risk of harm must be "more than mere speculation," *id.* at 601; "[a] presently existing actual threat must be shown," 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1.

In trademark infringement cases, courts have historically presumed irreparable harm once a plaintiff establishes likelihood of success on the merits. *See Paulsson*, 529 F.3d at 312 (collecting cases); *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 695 (N.D. Tex. 2015); *see also Restatement (Third) of Unfair Competition* § 35 cmt. h ("Absent special circumstances, courts will ordinarily grant a preliminary injunction in a trademark infringement action if there is strong evidence of a likelihood of confusion.").   But the Fifth Circuit "has avoided 'expressly adopting this

presumption of irreparable injury.'" *Paulsson*, 529 F.3d at 312 (quoting *S. Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 188 (5th Cir. Unit B 1982)). Moreover, recent Supreme Court cases have called into question whether this presumption is appropriate. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); *see also* 5 *McCarthy on Trademarks and Unfair Competition* § 30.47.30 ("Some courts have either hinted, indicated or outright held that the U.S. Supreme Court's 2006 decision in *eBay* eliminates the traditional presumption of irreparable injury triggered if a likelihood of success on the merits of trademark infringement is proven.").

In any event, the record supports a showing of irreparable harm. Defendants have appropriated a mark that the City has maintained for a century. Now, plaintiffs have "lost control" of the quality of the services associated with their mark.[73] *Paulsson*, 529 F.3d at 313; *see also* 5 *McCarthy on Trademarks and Unfair Competition* § 30.47.50 ("[I]n many situations, irreparable harm can be demonstrated by pointing to the fact that the trademark owner's business goodwill and reputation are in peril."). The potential harm to plaintiffs' reputation and goodwill cannot be quantified, and rises to the level of irreparable harm.[74] *Paulsson*, 529 F.3d at 313; *see*

---

[73] R. Doc. 18-1 at 23.

[74] *Id.*

38

*also Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014); *ADT*, 145 F. Supp. 3d at 696 ("[I]f one trademark user cannot control the quality of the unauthorized user's goods and services, he can suffer irreparable harm." (quoting *Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 640 (N.D. Tex. 2009)); *TGI Friday's Inc. v. Great Nw. Rests., Inc.*, 652 F. Supp. 2d 763, 771 (N.D. Tex. 2009) ("[D]efendants are promoting consumer confusion by holding out their restaurants as TGI Friday's locations even though TGIF does not sponsor or control defendants' restaurants. This consumer confusion means that TGIF no longer possesses control over its valuable trademarks or its reputation. This loss of control constitutes a substantial threat of irreparable injury."). Plaintiffs therefore face a substantial threat of irreparable harm absent an injunction.

### D.  Balance of Hardships

Without an injunction, plaintiffs stand to lose control over the services associated with St. Roch Market, and potentially face damage to their reputation and goodwill. If an injunction is granted, defendants will also experience hardship. Specifically, defendants will be unable to use their preferred name for the food halls defendants seek to open in other cities. This restriction means that defendants will be unable to capitalize on the reputation and goodwill associated with St. Roch Market. Defendants'

counsel also noted in oral argument that defendants have spent hundreds of thousands of dollars promoting the "St. Roch Market" brand. But any harm defendants may suffer is self-inflicted because defendants did not have the right to use the mark in the first place. *Cf. ADT*, 145 F. Supp. 3d at 699-700. Moreover, an injunction would not prevent defendants from opening food halls in other cities, so long as the food halls are not named "St. Roch Market." Nor would the injunction prevent defendants from continuing to operate St. Roch Market and Auction House Market in New Orleans. The Court finds that the balance of hardships weighs in favor of granting the injunction.

### E.    Public Interest

Finally, a preliminary injunction would not disserve the public interest. Here, where plaintiffs have established a substantial likelihood of success on the merits, an injunction would serve the public interest by preventing unfair competition and protecting intellectual property. These values promoted by trademark law outweigh the public's interest in competition and free exchange of ideas. *See Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989) (district court's finding that injunction served public interest "reflect[ed] the policy judgment implicit in copyright and unfair competition laws that the public's interest in competition may be

outweighed by the public's interest in preserving rights in intellectual property").

The Court further notes that St. Roch Market is a public institution with a rich history. It is one of only a few remnants of the once-extensive network of public markets in New Orleans. The City and other governmental bodies have invested substantial sums of money in the market over the years. The reputation of St. Roch Market and the goodwill associated with that name therefore belong to the public. In fact, Louisiana law explicitly recognizes the City's right to use, and exclude others from using, the name of a public facility owned by the City. *See* La. R.S. § 51:281.2(A) ("[N]o person shall transact any business under an assumed name which contains the name of any . . . public facility without the written consent of the governing authority of the governmental entity which owns or operates the . . . public facility."). For these reasons, the public interest would be served by enjoining defendants' infringing use of St. Roch Market.

The Court notes that the preliminary injunction will not affect defendants' Miami location. The Court need not, and does not, decide the proper scope of a permanent injunction at this time.

## IV.  PRELIMINARY INJUNCTION

The Court has found that plaintiffs have satisfied the requirements for preliminary injunctive relief.  Accordingly, the Court preliminarily enjoins and restrains defendants, Bayou Secret, LLC, St. Roch Design District, LLC, Helpful Hound, L.L.C., St. Roch F&B, LLC, William Donaldson, Barre Tanguis, and David Donaldson, as well as their officers, agents, servants, employees, attorneys, successors, and assigns, and all others in active concert or participation with them, from using the designation "St. Roch Market" in connection with any food hall, or any other type of public food market, at any location other than 2381 St. Claude Avenue, New Orleans, Louisiana and 140 NE 39th Street, Suite 241, Miami, Florida.  This preliminary injunction shall remain in effect until a trial is conducted on the merits, or until it is otherwise modified by the Court.


New Orleans, Louisiana, this __7th__ day of August, 2018.


_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE